JS-6

**O**

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID GOULD;<br>KAUSHIK IYENGAR;<br>BRENDON LOBO;<br>JOHN NIXON;<br>JANE CHANG BRIGHT;<br>SHANE MAHON;<br>PETER CONHEIM; and<br>KINGSLEY BARNIE, individually and<br>    on behalf of all others similarly<br>    situated,<br><br>            Plaintiffs,<br><br>   v.<br><br>HYUNDAI MOTOR COMPANY;<br>HYUNDAI MOTOR AMERICA;<br>KIA CORPORATION;<br>KIA AMERICA, INC.;<br>GENESIS MOTOR, LLC; and<br>GENESIS MOTOR AMERICA LLC,<br><br>            Defendants. | Case No. 8:23-cv-01344-JWH-DFM<br><br>**ORDER GRANTING<br>DEFENDANTS' MOTIONS TO<br>COMPEL ARBITRATION [ECF<br>No. 29 and 32]** |

# I. SUMMARY OF DECISION

Before the Court are two motions:

- the motion of Defendant Kia America, Inc. to compel arbitration of the claims asserted by Plaintiffs Jane Chang Bright and Kingsley Barnie;[1] and
- the motion of Defendant Hyundai Motor America, Inc. to compel arbitration of the claims asserted by Plaintiffs David Gould, Kaushik Iyengar, Brendon Lobo, John Nixon, Shane Mahon, and Peter Conheim.[2]

The Court concludes that these matters are appropriate for resolution without a hearing. *See* Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support and in opposition,[3] the Court orders that the Motions are **GRANTED**,[4] for the reasons set forth herein.

# II. BACKGROUND

## A. Procedural History

In July 2023, Plaintiffs David Gould, Kaushik Iyengar, and John Nixon commenced this action, on behalf of themselves and all others similarly situated.[5] Two months later, Plaintiffs Jane Chang Bright, Peter Conheim, Kingsley Barnie, and Shane Mahon, on behalf of themselves and all others similarly situated, commenced a related action.[6] Both actions arise from allegations that Defendants Hyundai Motor Company, Ltd.; Hyundai Motor America, Inc.; Kia America, Inc.; Kia Corporation; Genesis Motor

---

[1]    Def. Kia America, Inc.'s Mot. to Compel Individual Arbitration (the "Kia Motion") [ECF No. 29].

[2]    Def. Hyundai Motor America Inc.'s Mot. to Compel Individual Arbitration (the "Hyundai Motion") [ECF No. 32].

[3]    *See* Pls.' Omnibus Opposition to the Kia Motion and the Hyundai Motion (the "Opposition") [ECF No. 38].

[4]    The Court considered the documents of record in this action, including the following papers: (1) First Am. Consolidated Class Action Compl. (the "Amended Complaint") [ECF No. 27]; (2) Kia Motion (including its attachments); (3) Hyundai Motion (including its attachments); (4) Opposition (including its attachments); (5) Kia's Reply in Supp. of the Kia Motion (the "Kia Reply") (including its attachments) [ECF No. 40]; and (6) Hyundai's Reply in Supp. of the Hyundai Motion (the "Hyundai Reply") (including its attachments) [ECF No. 41].

[5]    Compl. [ECF No. 1].

[6]    *Bright v. Hyundai Motor Co. Ltd.*, Case No. 8:23-cv-01602-JWH-DFM (C.D. Cal. Sept. 27, 2023) [ECF No. 1] (the "*Bright* Case").

LLC; and Genesis Motor America LLC manufactured, sold, and leased electric vehicles that do not charge reliably or as advertised.  In October 2023, the parties stipulated to consolidate the instant action and the *Bright* Case.[7]  The Court granted that stipulation and concluded that this action and the *Bright* Case are appropriate for consolidation under Rule 42(a) of the Federal Rules of Civil Procedure.[8]

Later in October 2023, Plaintiffs filed their consolidated Amended Complaint. The next month, Kia and Hyundai moved to compel arbitration.  In the Kia Motion, Kia notes that Kia Corporation has not been served, but, assuming that Kia Corporation is later served and is subject to personal jurisdiction, the arbitration agreement applies equally to that entity.[9]  Similarly, in the Hyundai Motion, Hyundai notes that Hyundai Motor Company has not been served, but, assuming that Hyundai Motor Company is later served and is subject to personal jurisdiction, the arbitration agreement likewise applies equally to that entity.[10]

These Motions are fully briefed.  Plaintiffs filed an Omnibus Opposition,[11] which responds to the arguments that Kia and Hyundai make in both Motions.  Kia and Hyundai filed Replies[12] in support of their respective Motions.

**B.    Facts**

The factual allegations in the Amended Complaint are summarized as follows:

- Gould, a New York resident, purchased a MY 2023 Ioniq 5 electric vehicle from a Hyundai dealership in New York.[13]
- Iyengar, a Georgia resident, purchased a MY 2023 Ioniq 5 Limited electric vehicle from a Hyundai dealership in New York.[14]
- Lobo, a Georgia resident, purchased a Hyundai 5 SE electric vehicle from a Hyundai dealership in Georgia.[15]

---

[7]    Joint Stip. to Transfer and Consolidate Cases [ECF No. 31 in the *Bright* Case].

[8]    Ord. Granting Joint Stip. to Consolidate Cases [ECF No. 28].

[9]    Kia Motion 6:26-28 n.1.

[10]    Hyundai Motion 7:26-28 n.1.

[11]    *See* Opposition.

[12]    *See* Kia Reply; Hyundai Reply.

[13]    Amended Complaint ¶ 11.

[14]    *Id.* at ¶ 14.

[15]    *Id.* at ¶ 19.

- Nixon, a Florida resident, entered into a two-year contract to lease a new MY 2023 Ioniq 5 electric vehicle from a Hyundai dealership in Florida.[16]
- Bright, a California resident, purchased a MY 2022 Kia EV6 electric vehicle from a Kia dealership in California.[17]
- Mahon, a resident of Illinois, purchased a MY 2022 Hyundai Ioniq 5 electric vehicle from a Hyundai dealership in Wisconsin.[18]
- Conheim, a California resident, purchased a MY 2022 Hyundai Ioniq 5 electric vehicle from a Hyundai dealership in New Mexico.[19]
- Barnie, a New York resident, purchased a MY 2022 Kia EV6 electric vehicle from a Kia dealership in New York.[20]

In this class action lawsuit, Plaintiffs allege that the Class Vehicles—defined as the Hyundai Ioniq 5, Ioniq 6, Kia EV6, Kia Niro EV, Kia PHEV, and Genesis GV60[21]—are defective and that they do not charge as advertised.[22]  The Nationwide Class is defined as all persons or entities who purchased or leased one or more of the Class Vehicles.[23]  The State Sub-Classes are defined as all members of the Nationwide Class in California, Florida, Georgia, Illinois, New Mexico, and New York.[24]

Plaintiffs allege that Defendants knowingly and intentionally concealed the Class Vehicles' defects.[25]  Plaintiffs contend that they would not have purchased the Class Vehicles, or would have paid less, if Defendants disclosed the defects.[26]  Plaintiffs assert the following 19 claims for relief:

- violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030;[27]

---

[16]    *Id.* at ¶ 22.

[17]    *Id.* at ¶ 25.

[18]    *Id.* at ¶ 30.

[19]    *Id.* at ¶ 35.

[20]    *Id.* at ¶ 40.

[21]    *Id.* at ¶ 2 n.1.

[22]    *See generally id.*

[23]    *Id.* at ¶ 92.

[24]    *Id.*

[25]    *Id.* at ¶ 153.

[26]    *Id.* at ¶ 13.

[27]    *Id.* at ¶¶ 102-122.

- violation of the California Computer Data Access and Fraud Act, Cal. Penal Code § 502;[28]
- violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200;[29]
- violations of the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750;[30]
- violation of the California False Advertising Law, Cal. Bus. & Prof. Code § 17500;[31]
- trespass to chattels;[32]
- violations of New York General Business Law § 349;[33]
- violations of New York General Business Law § 350;[34]
- unjust enrichment;[35]
- violation of Georgia's Fair Business Practices Act, GA. Code Ann. § 10-1-390;[36]
- violation of the Georgia Uniform Deceptive Trade Practices Act, GA. Code Ann. § 10-1-370;[37]
- unjust enrichment;[38]
- violations of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201;[39]
- unjust enrichment;[40]
- violations of the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750;[41]

---

[28] *Id.* at ¶¶ 123-140.

[29] *Id.* at ¶¶ 141-148.

[30] *Id.* at ¶¶ 149-165.

[31] *Id.* at ¶¶ 166-173.

[32] *Id.* at ¶¶ 174-181.

[33] *Id.* at ¶¶ 182-198.

[34] *Id.* at ¶¶ 199-215.

[35] *Id.* at ¶¶ 216-225.

[36] *Id.* at ¶¶ 226-240.

[37] *Id.* at ¶¶ 241-245.

[38] *Id.* at ¶¶ 246-255.

[39] *Id.* at ¶¶ 256-268.

[40] *Id.* at ¶¶ 269-278.

[41] *Id.* at ¶¶ 279-295.

- violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200;[42]
- violation of the California False Advertising Law, Cal. Bus. & Prof. Code § 17500;[43]
- violation of the Illinois Consumer Fraud Act, 815 ILCS 505/1-12;[44] and
- violation of the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1.[45]

## III.  LEGAL STANDARD

Pursuant to the Federal Arbitration Act (the "FAA"), "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  While the FAA reflects a "liberal federal policy favoring arbitration," *AT & T Mobility v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983)), "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960).  "Because the FAA mandates that 'district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed,' the FAA limits courts' involvement to 'determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue.'"  *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008) (internal citations and emphasis omitted) (citing *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1131 (9th Cir. 2000)).

In evaluating the validity of an arbitration agreement, a federal court "appl[ies] ordinary state-law principles that govern the formation of contracts," *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)), "while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration," *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1044 (9th Cir. 2009) (quoting *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1049 (9th Cir. 1996)).

---

[42]    *Id.* at ¶¶ 296-303.

[43]    *Id.* at ¶¶ 304-311.

[44]    *Id.* at ¶¶ 312-321.

[45]    *Id.* at ¶¶ 322-334.

## IV.  DISCUSSION

### A.    Valid Agreements to Arbitrate Exist

#### 1.    Applicable Law

"The threshold issue in deciding a motion to compel arbitration is 'whether the parties agreed to arbitrate.'"  *Quevedo v. Macy's, Inc.*, 798 F. Supp. 2d 1122, 1133 (C.D. Cal. 2011) (citing *Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754, 756 (9th Cir. 1988)).  "In determining whether the parties have agreed to arbitrate, 'district courts rely on the summary judgment standard of Rule 56 of the Federal Rules of Civil Procedure.'"  *Pierre v. IEC Corp.*, 2023 WL 3551962, at *3 (C.D. Cal. Mar. 14, 2023) (citing *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021)).  A factual dispute is genuine if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "[O]nce a district court concludes that there are genuine disputes of material fact as to whether the parties formed an arbitration agreement, the court must proceed without delay to a trial on arbitrability and hold any motion to compel arbitration in abeyance until the factual issues have been resolved."  *Hansen*, 1 F.4th at 672.

#### 2.    Plaintiffs' Enrollment in the Services Providing Arbitration Agreements

##### a.    Kia

###### i.    Kia Connect Services

In the Kia Motion, Kia asserts that Bright and Barnie enrolled in Kia Connect, "an integrated in-vehicle communications and entertainment system that provides consumers with vehicle features such as navigation, alerts, roadside assistance, and cloud voice recognition.  [Kia Connect] also allows consumers to perform various tasks from their smartphone, including vehicle charging, including remotely charging their vehicle, setting charging schedules, and receiving charging status notifications." [46]  Bright and Barnie have "repeatedly logged into their Kia Connect accounts," and, by doing so, they "agreed to the current version of the Kia Connect Terms of Service." [47]

---

[46]    Decl. of Sujith Somasekharan in Supp. of the Kia Motion (the "Somasekharan Declaration") [ECF No. 29-2] ¶¶ 4 & 6.

[47]    *Id.* at ¶ 16.

To enroll in Kia Connect, a consumer selects the "Kia Connect" button on the dashboard, followed by the "Kia Connect Settings" button.[48]  After making those selections, the consumer is directed to another screen, where he or she is required to click "Activate Service."[49]  Then the consumer is presented with the Kia Connect Terms of Service on the dashboard screen.[50]  The consumer can scroll through the Terms of Service, and he or she is required to check a box agreeing to those terms.[51]  After completing that initial in-vehicle step, the consumer is prompted to enter his or her mobile phone number or email address to obtain a verification code necessary to complete enrollment.[52]  The consumer then receives the Kia Owners Portal registration page, which requires the consumer to select a checkbox acknowledging that he or she has "read and agree[d] to the Kia Connect Terms of Service" before he or she can create an account and obtain a verification code.[53]  The phrase "Kia Connect Terms of Service" is offset in red, italicized text, and, if it is clicked, the system presents the consumer with the full text of the agreement.[54]  After agreeing to the Terms of Service by selecting the checkbox, the consumer must click a button stating "ACCEPT TO GET THE CODE."[55]  The consumer also must complete a single webform entitled "CREATE ACCOUNT," which requires the consumer to enter his or her personal information.[56]  After entering that information, the consumer is required to select another checkbox acknowledging that he or she has "read and agree[d] to the General Terms of Use."[57]  Then the consumer presses the "SAVE" button, thereby accepting and agreeing to the General Terms of Use.[58]  After completing those steps, the consumer is provided with a verification code, which he or she must enter on the vehicle's on-screen dashboard to complete the enrollment process.[59]

---

[48]     *Id.* at ¶ 7.

[49]     *Id.*

[50]     *Id.*

[51]     *Id.*

[52]     *Id.* at ¶ 8.

[53]     *Id.* at ¶ 9.

[54]     *Id.*

[55]     *Id.*

[56]     *Id.* at ¶ 10.

[57]     *Id.*

[58]     *Id.*

[59]     *Id.*

## ii.    Kia Arbitration Agreement

The Kia Connect Terms of Service provide as follows:

> These terms require you to arbitrate any disputes you have with us on an
> individual basis.  This means you waive the ability to bring claims against us
> in a class or representative action to the maximum extent permitted by law.[60]

The consumer agrees to arbitrate "any matters relating to or arising out of your Vehicle
purchase, ownership, or lease, except any disputes or claims which are under governing
law are not subject to arbitration, to the maximum extent permitted by applicable law."[61]
The arbitration agreement includes, but is not limited to, "claims based in contract, tort,
warranty, statute, fraud, misrepresentation or any other legal theory[.]"[62]  The arbitration
agreement states that "the Federal Arbitration Act governs the interpretation and
enforcement of this arbitration provision."[63]  "All issues are for the arbitrator to decide,
including the scope and enforceability of this arbitration provision as well as the
Agreement's other terms and conditions[.]"[64]

## iii.    Plaintiffs' Response

In Plaintiffs' Opposition, Bright asserts that she did not know that there was an
arbitration agreement anywhere in the Terms and Conditions of the Kia Connect
Service.[65]  Bright contends that her vehicle's Connected Services were configured at the
dealership.[66]  Specifically, a dealership employee instructed Bright to sign up for the
Connected Services by using her cell phone.[67]  The dealership employee assisted her with
the signup process.[68]  At one point, Bright passed her cell phone to the dealership
employee so that the employee could make sure that Bright was enrolling properly.[69]
Bright contends that a dealership employee never told her about an arbitration agreement,

---

[60]    Somasekharan Declaration, Ex. D ("Kia's Exhibit D") [ECF No. 29-6] 2; *id.*, Ex. F
("Kia's Exhibit F") [ECF No. 29-8] 2.

[61]    Kia's Exhibit D 29; Kia's Exhibit F 13.

[62]    Kia's Exhibit D 30; Kia's Exhibit F 13.

[63]    Kia's Exhibit D 30; Kia's Exhibit F 14.

[64]    Kia's Exhibit D 32; Kia's Exhibit F 14.

[65]    Decl. of Jane Chang Bright in Supp. of the Opposition (the "Bright Declaration") [ECF
No. 38-5] ¶ 3.

[66]    *Id.* at ¶ 4.

[67]    *Id.*

[68]    *Id.*

[69]    *Id.*

never showed her the Terms of Service, and never gave her a chance to accept, reject, question, or revise them.[70]  Bright asserts that she did not give the dealership employees authority to accept an arbitration agreement on her behalf.[71]  She testifies that "[t]he only authority [she] gave to dealership employees was to assist [her] with purchasing the vehicle and to verify that [she] was proceeding through the Connected Services signup process."[72]

Similarly, Barnie asserts that he did not know that there was an arbitration agreement anywhere in the Terms and Conditions of the Kia Connect Services.[73]  Barnie contends that his vehicle's Connect Services were configured at the dealership.[74]  The dealership employee told Barnie that Barnie should download the app and that it was important for using the vehicle's capabilities to their fullest extent, such as charging and remote starting.[75]  The dealership employee directed Barnie to the correct mobile app store and told him which app to download.[76]  Barnie asserts that a dealership employee never told him about an arbitration agreement, never showed him the Terms of Service, and never gave him a chance to accept, reject, question, or revise them.[77]  Barnie testifies that "[t]he only authority [he] gave to dealership employees was to assist [him] with purchasing the vehicle."[78]

### b.    Hyundai

#### i.    BlueLink Services

Similarly, in the Hyundai Motion, Hyundai argues that Gould, Iyengar, Lobo, Nixon, Conheim, and Mahon enrolled in Hyundai BlueLink Services, "a connected car system that includes various functions and features."[79]  Gould, Iyengar, Lobo, Nixon, and

---

[70]    *Id.* at ¶ 5.

[71]    *Id.*

[72]    *Id.*

[73]    Decl. of Kingsley Barnie in Supp. of the Opposition (the "Barnie Declaration") [ECF No. 38-8] ¶ 3.

[74]    *Id.* at ¶ 4.

[75]    *Id.* at ¶ 5.

[76]    *Id.* at ¶ 4.

[77]    *Id.* at ¶ 5.

[78]    *Id.*

[79]    Decl. of Vijay Rao in Supp. of the Hyundai Motion (the "Rao Declaration") [ECF No. 32-2] ¶¶ 8 & 10-15.

Conheim each enrolled through the same Dealer-Assisted Enrollment process.[80]  Mahon
enrolled through the online Customer Web Portal enrollment process,[81] while Iyengar,
Lobo, Mahon, and Conheim subsequently logged into the Hyundai Connected Services
mobile application.[82]

To enroll through the Dealer-Assisted Enrollment Process, a customer agrees to
the then-effective Connected Services Agreement, which is often called the Terms and
Conditions.[83]  A consumer must click the box to acknowledge that he or she has "read
and agree[d] to the Blue Link Terms & Conditions[.]"[84]  A consumer would then have to
click the box to acknowledge his or her assent to the Terms and Conditions.[85]  To enroll
through the Customer Web Portal process, a consumer must click the box to acknowledge
that he or she has "agree[d] to the Terms & Conditions" and then would have to click
the "Place Order" button.[86]

### ii.    Hyundai Arbitration Agreement

The Hyundai BlueLink Terms and Services include the following arbitration
agreement:

> Hyundai and you agree to arbitrate any and all disputes and claims between
> us arising out of or relating to this Agreement, Connected Services,
> Connected Services Systems, Service Plans, the Vehicle, use of the sites, or
> products, services, or programs you purchase, enroll in or seek product
> support/service support for, whether you are a Visitor or Customer, via the
> sites or through mobile application, except any disputes or claims which
> under governing law are not subject to arbitration, to the maximum extent
> permitted by applicable law.  This agreement to arbitrate is intended to be
> broadly interpreted and to make all disputes and claims between us subject to
> arbitration . . . to arbitrate otherwise includes, but is not limited to:  claims

---

[80]    *Id.* at ¶¶ 10-14.

[81]    *Id.* at ¶ 15.

[82]    *Id.* at ¶¶ 21-25.

[83]    *Id.* at ¶¶ 9 & 16.

[84]    *Id.* at ¶ 17.

[85]    *Id.*

[86]    *Id.* at ¶ 18.

based in contract, tort, warranty, statute, fraud, misrepresentation or any legal theory . . . .[87]

The arbitration agreement further provides:

[Y]ou and Hyundai are each waiving the right to a trial by jury or to participate in a class or representative action to the maximum extent permitted by law. This Agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this arbitration provision.[88]

### iii.    Plaintiffs' Response

Gould asserts that he did not know that there was an arbitration agreement anywhere in the Hyundai BlueLink Terms and Conditions.[89] A dealership employee set up the Connected Services for Gould by downloading the app on Gould's phone, registering him, and signing into the app using his newly registered profile.[90] Gould did not accept any terms; the services were set up and were fully functional before he began using them.[91] Gould testifies that a dealership employee never told him anything about an arbitration agreement, never showed him the terms, and never gave him a chance to accept, reject, question, or revise them.[92] Gould "did not give the dealership employees authority to accept an arbitration agreement on [his] behalf."[93]

Similarly, Iyengar asserts that he did not know that there was an arbitration agreement in the Hyundai BlueLink Terms and Conditions.[94] A dealership employee completed the configuration process for him, and Iyengar does not recall accepting any terms associated with Hyundai BlueLink.[95] Iyengar testifies that a dealership employee never told him anything about an arbitration agreement, never showed him the Terms

---

[87]    Rao Declaration, Ex. C ("Hyundai's Exhibit C") [ECF No. 32-5] 12 (emphasis omitted); *id.*, Ex. D ("Hyundai's Exhibit D") [ECF No. 32-6] 11.

[88]    Hyundai's Exhibit C 13; Hyundai's Exhibit D 11.

[89]    Decl. of David Gould in Supp. of the Opposition (the "Gould Declaration") [ECF No. 38-2] ¶ 3.

[90]    *Id.* at ¶ 4.

[91]    *Id.* at ¶ 5.

[92]    *Id.* at ¶ 6.

[93]    *Id.*

[94]    Decl. of Kaushik Iyengar in Supp. of the Opposition (the "Iyengar Declaration") [ECF No. 38-3] ¶ 3.

[95]    *Id.* at ¶ 4.

and Conditions, and never gave him a chance to accept, reject, question, or revise them.[96]
Iyengar "did not give the dealership employees authority to accept an arbitration
agreement on [his] behalf."[97]

Lobo also asserts that he did not know that there was an arbitration agreement in
the Hyundai BlueLink Terms and Conditions.[98]  The dealership employee asked Lobo to
download the Connected Services app.[99]  The dealership employee explained that the
configuration of the Connected Services app was a "mandatory step" for the delivery of
Lobo's vehicle.[100]  The dealership employee configured the Connected Services app for
Lobo and then handed his phone back to him.[101]  Lobo testifies that a dealership employee
never told him about an arbitration agreement, never showed him the Terms and
Conditions, and never gave him the chance to accept, reject, question, or revise them.[102]
Lobo "did not give the dealership employees authority to accept an arbitration agreement
on [his] behalf."[103]  Lobo asserts that the "only authority [he] gave to dealership
employees was to configure the Connected Services app."[104]

Nixon likewise asserts that he did not know that there was an arbitration
agreement in the Hyundai BlueLink Terms and Conditions.[105]  The dealership delivered
the vehicle to Nixon, and he was never physically present at the dealership.[106]  The
dealership employee did not discuss Connected Services with Nixon.[107]  Nixon testifies
that a dealership employee never told him about an arbitration agreement, never showed
him the Terms and Conditions, and never gave him a chance to accept, reject, question,

---

[96]    *Id.* at ¶ 5.

[97]    *Id.*

[98]    Decl. of Brendon Lobo in Supp. of the Opposition (the "Lobo Declaration") [ECF
No. 38-1] ¶ 3.

[99]    *Id.* at ¶ 4.

[100]    *Id.*

[101]    *Id.*

[102]    *Id.* at ¶ 5.

[103]    *Id.*

[104]    *Id.*

[105]    Decl. of John Nixon in Supp. of the Opposition (the "Nixon Declaration") [ECF
No. 38-4] ¶ 3.

[106]    *Id.* at ¶ 5.

[107]    *Id.*

or revise them.[108]  Nixon asserts that he "did not give the dealership employees authority
to accept an arbitration agreement on [his] behalf."[109]

Conheim asserts that he also did not know that there was an arbitration agreement
in the Hyundai BlueLink Terms and Conditions.[110]  Conheim's vehicle's Connected
Services were configured at the dealership when Conheim picked up the vehicle.[111]  A
dealership employee obtained Conheim's email address and phone number, and Conheim
believes that the dealership employee used that information to begin the Connected
Services setup process.[112]  The Connected Services did not function properly, so
Conheim later called Hyundai's customer service department for assistance in setting up
the Connected Services.[113]  The dealership employee gave Conheim "a quick summary of
any terms and conditions, instructing [him] to accept them in order to obtain the vehicle
and access the Connected Services."[114]  A dealership employee never told Conheim about
an arbitration agreement, never showed him the Terms and Conditions, and never gave
him the chance to accept, reject, question, or revise them.[115]  Conheim "did not give the
dealership employees authority to accept an arbitration agreement on [his] behalf."[116]
"The only authority [he] gave to dealership employees was to assist [him] with
purchasing the vehicle, and to begin the Connected Services signup process."[117]

Finally, Mahon asserts that he did not know that there was an arbitration
agreement in the Hyundai BlueLink Terms and Conditions.[118]  Mahon's vehicle's
Connected Services were configured at the dealership.[119]  The dealership employee made
it "seem like a vehicle purchaser was required to sign up for [Connected Services] in

---

[108]    *Id.* at ¶ 6.

[109]    *Id.*

[110]    Decl. of Peter Conheim in Supp. of the Opposition (the "Conheim Declaration") [ECF
No. 38-6] ¶ 3.

[111]    *Id.* at ¶ 4.

[112]    *Id.*

[113]    *Id.*

[114]    *Id.* at ¶ 7.

[115]    *Id.* at ¶ 8.

[116]    *Id.*

[117]    *Id.*

[118]    Decl. of Shane Mahon in Supp. of the Opposition (the "Mahon Declaration") [ECF
No. 38-7] ¶ 3.

[119]    *Id.* at ¶ 4.

order to use the vehicle."[120]  The dealership employee also explained that, if Mahon
signed up for the Connected Services, then he would receive a free two-year subscription
to a third-party electric vehicle charging network.[121]  The dealership employee instructed
Mahon to download the Connected Services app.[122]  During the signup process, Mahon
received an email from Hyundai to set a password for the Connected Services.[123]  At
certain points during the signup process, "the dealership employee may have asked to use
[his] cell phone as part of the process, and [he] may have provided it to him."[124]  Mahon
does not recall accepting the terms himself.[125]  Mahon testifies that a dealership employee
never told him about an arbitration agreement, never showed him the Terms and
Conditions, and never gave him the chance to accept, reject, question, or revise them.[126]
Mahon "did not give the dealership employees authority to accept an arbitration
agreement on [his] behalf.  The only authority [he] gave to dealership employees was to
assist [him] with the purchase of the vehicle and the Connected Services signup
process."[127]

### 3.    Analysis

After considering the relevant facts, the applicable law, and the positions of all
parties, the Court concludes that a valid agreement to arbitrate exists between Plaintiffs
and Kia and Hyundai.

Plaintiffs argue that the relevant law governing these motions varies according to
the state in which each Plaintiff purchased his or her subject vehicle:  California (Bright),
Georgia (Lobo), Wisconsin (Mahon), Florida (Nixon), New Mexico (Conheim), and New
York (Barnie, Gould, and Iyengar).[128]  Hyundai asserts that the Terms and Conditions are
governed by California law, but "[e]ven if Plaintiffs' home states' law applied, the
analysis would be the same."[129]  For avoidance of doubt, the Court applies the state law
where each Plaintiff purchased the subject vehicle.  *See Franz v. Hyundai Motor Am.*, 2024

---

[120]     *Id.*

[121]     *Id.*

[122]     *Id.* at ¶ 5.

[123]     *Id.*

[124]     *Id.* at ¶ 6.

[125]     *Id.*

[126]     *Id.* at ¶ 7.

[127]     *Id.*

[128]     Opposition 4:20-22.

[129]     Hyundai Reply 8:26-28 n. 1.

WL 176227, at *6 (C.D. Cal. Jan. 12, 2024) (applying South Carolina law to analogous facts and arbitration language when the plaintiff purchased the vehicle in South Carolina).

### a.    Clickwrap Agreements

Kia and Hyundai contend that the Kia Connect and Hyundai BlueLink Terms of Service are clickwrap agreements.[130]  Under a clickwrap agreement, a "user is required to affirmatively acknowledge the agreement before proceeding with use of the website." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014).  Courts regularly enforce arbitration clauses contained in clickwrap agreements.  *See, e.g.*, *Valiente v. StockX, Inc.*, 645 F. Supp. 3d 1331, 1338 (S.D. Fla. 2022) (citation omitted) (granting a motion to compel arbitration and noting that "[i]n Florida and the federal circuits . . . click-wrap agreements are valid and enforceable contracts"); *Rahim v. Chime Fin., Inc.*, 2022 WL 18459836, at *2 (N.D. Ga. Nov. 14, 2022) (noting that "Georgia courts have generally ruled that arbitration clauses" contained in clickwrap agreements are "enforceable"); *Griffin v. Vivint Solar, Inc.*, 2021 WL 2186408, at *7 (D.N.M. May 28, 2021) (citation omitted) (granting a motion to compel arbitration and noting that the "Tenth Circuit has 'routinely' upheld these type of 'clickwrap' agreements as enforceable"); *Velasquez-Reyes v. Samsung Elecs. Am., Inc.*, 2020 WL 6528422, at *3 (C.D. Cal. Oct. 20, 2020) ("clickwrap agreements have been consistently upheld by the courts and used to compel arbitration"); *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 549 (S.D.N.Y. 2018) (citation omitted) (in "New York, clickwrap agreements are valid and enforceable contracts").

### b.    Authority Given to Dealership Employees

Plaintiffs argue that the agreements cannot be enforced against them because Plaintiffs were not shown the Kia Connect or Hyundai BlueLink Terms of Service and Plaintiffs did not authorize Defendants' employees to consent to Defendants' respective terms.[131]  But those arguments fail to create genuine issues of material fact regarding the existence of an Arbitration Agreement.

Lobo, Conheim, Mahon, and Bright expressly admit that they gave authority to dealership employees to begin, assist, or configure the Connected Services signup process.[132]  Gould implicitly acknowledges that he gave his phone to a dealership

---

[130]    Kia Motion 12:9-10; Hyundai Motion 7:23.

[131]    Gould Declaration ¶ 6; Iyengar Declaration ¶ 5; Lobo Declaration ¶ 5; Nixon Declaration ¶ 6; Bright Declaration ¶ 5; Conheim Declaration ¶ 8; Mahon Declaration ¶ 7; Barnie Declaration ¶ 5.

[132]    Lobo Declaration ¶ 5; Conheim Declaration ¶ 8; Mahon Declaration ¶ 7; Bright Declaration ¶ 5.

employee to set up the Connected Services app.[133]  Iyengar admits that a dealership
employee completed the configuration process for him the same day that he received the
vehicle at the Hyundai dealership.[134]

Nixon asserts that the dealership delivered the vehicle to him and that the
dealership employee did not discuss Connected Services with him.[135]  However, Nixon
fails to explain how his vehicle was enrolled in BlueLink.

Barnie admits that she was "sitting in the vehicle" with a dealership employee as a
part of the enrollment process.  The dealership employee directed Barnie to the correct
mobile app store and told her which app to download.[136]

### c.    Agency Relationship Created

Based upon the facts recited above, Plaintiffs cannot dispute that dealership
employees were acting as their agents.  Under California law, an agency relationship may
be created informally through "conduct by each party manifesting acceptance of a
relationship whereby one of them is to perform work for the other under the latter's
direction."  *Malloy v. Fong*, 37 Cal. 2d 356, 372 (1951).  "The power of the principal to
terminate the services of the agent gives him the means of controlling the agent's
activities."  *Id.* at 370.  "Under Georgia law, an agency relationship can arise in three
distinct ways:  expressly, by implication, or through subsequent ratification by the
principal of the agent's conduct."  *J'Carpc, LLC v. Wilkins*, 545 F. Supp. 2d 1330, 1337
(N.D. Ga. 2008).  "In order that acts of an agent be binding on his alleged principal, a
principal and agent relationship must be proved and it must be established that agent
acted within scope of authority."  *Anaya v. Coello*, 279 Ga. App. 578, 580 (2006).  "Under
Wisconsin common law, agency doctrine allows a person to bind and be bound by the
actions of another designated to act on his or her behalf."  *Kolbe & Kolbe Millwork, Co. v.
Manson Ins. Agency, Inc.*, 983 F. Supp. 2d 1035, 1041 (W.D. Wis. 2013).  Under Florida
law, a principal can create the appearance of an agent's authority by knowingly permitting
an agent to act in a certain manner as if he or she were authorized, by failing to correct a
known misrepresentation by an agent that the agent has certain authority, or by silently
acting in a manner that creates a reasonable appearance of an agent's authority.  *See Ja
Dan, Inc. v. L-J, Inc.*, 898 F. Supp. 894, 900 (S.D. Fla. 1995).  Under New Mexico law,
the principal's "right to control, and not the actual exercise of control" is "an essential
element of an agency relationship."  *Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d

---

[133]    Gould Declaration ¶ 4.

[134]    Iyengar Declaration ¶ 4.

[135]    Nixon Declaration ¶ 5.

[136]    Barnie Declaration ¶ 4.

1242, 1253 (10th Cir. 2020).  Under New York law, an "agency relationship can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account."  *Liu Jo S.P.A. v. Jenner*, 630 F. Supp. 3d 501, 516 (S.D.N.Y. 2022) (citation omitted).

In *Velasquez-Reyes*, the plaintiff took a phone to a T-Mobile store for activation.  *See Velasquez-Reyes*, 2020 WL 6528422, at *1.  The sales representative completed the set-up process at the store.  *See id.*  The phone displayed a Terms and Conditions page, which contained a binding arbitration clause.  *See id.*  The sales representative could not continue setting up the phone until clicking an "Agree to all" bubble next to the words "Terms and Conditions."  *See id.*  The sales representative then had to click "Next" to continue.  *See id.*  The sales representative did not say anything to the plaintiff about the arbitration agreement or about any other terms and conditions.  *See id.* at *2.  The court enforced the arbitration agreement.  Applying California agency principles, the court concluded that the plaintiff "could have asked the representative to stop at any time or asked for his [phone] back, meaning the representative was subject to his control."  *Id.* at *3; *see also, e.g.*, *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 269 (E.D.N.Y. 2019) (granting a motion to compel arbitration under agency principles when the plaintiff gave her account password to her friend and allowed the friend to enroll the plaintiff in the service); *Hofer v. Gap, Inc.*, 516 F. Supp. 2d 161, 175 (D. Mass. 2007) (concluding that the plaintiff was bound to Expedia's terms and conditions under agency principles by giving her friend permission to book her travel plans on the website).

In three recent cases, district courts have enforced orders compelling arbitration with respect to analogous facts and the same arbitration language.  *See Franz*, 2024 WL 176227, at *6 (concluding that an agency relationship existed between the plaintiff and the dealership employee when the dealership employee enrolled the plaintiff into BlueLink services); *Tamburo v. Hyundai Motor Am. Corp.*, 2024 WL 22230, at *4 (N.D. Ill. Jan. 2, 2024) (concluding that the plaintiff agreed to the arbitration provision when signing up for BlueLink services); *Maranda v. Hyundai Motor Am., Inc.*, 2023 WL 6474450, at *7 (C.D. Cal. Oct. 2, 2023) (concluding that "the dealership employees acted as [p]laintiffs' agents" by completing the sign-up processes for BlueLink and Kia services).

### d.    Conclusion

In view of those authorities, the Court concludes as a matter of law that Plaintiffs authorized dealership employees to enter into the agreements on their behalf.  Additionally, Bright, Barnie, Lobo, Iyengar, Mahon, and Conheim assented to the services' Terms of Use by subsequently logging into the Hyundai BlueLink Connected Services and Kia Services applications.  Plaintiffs fail to dispute that the dealership

employees were acting as their agents.  Therefore, the Court concludes that a valid agreement to arbitrate exists.

## B.    The Arbitration Agreements Encompass Plaintiffs' Claims

Kia and Hyundai assert that Plaintiffs' claims are covered by the arbitration agreements.[137]  Plaintiffs do not address that point.  Therefore, any argument that Plaintiffs could make in defense is waived.  *See Hartranft v. Encore Cap. Grp., Inc.*, 2021 WL 2473951, at *10 (S.D. Cal. June 16, 2021) ("where a non-moving party fails to address an argument raised by the moving party in the opposition brief, the Court may consider any arguments unaddressed by the non-moving party as waived").  Accordingly, the Court concludes that the arbitration agreements encompass Plaintiffs' claims.

## C.    Unconscionability

Plaintiffs argue that the arbitration agreements are unenforceable because they are procedurally and substantively unconscionable.[138]

In California, contractual unconscionability has both a procedural and a substantive component.  *See Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000).  To establish unconscionability, "the party opposing arbitration must demonstrate that the contract as a whole or a specific clause in the contract is ***both*** procedurally and substantively unconscionable."  *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1260 (9th Cir. 2017) (citing *Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 910 (2015)) (emphasis added).  California uses a sliding scale to determine unconscionability:  "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa."  *Id.* (quoting *Sanchez*, 61 Cal. 4th at 910).

"Georgia's unconscionability doctrine contemplates both procedural unconscionability, which 'addresses the process of making the contract,' and substantive unconscionability, which 'looks to the contractual terms themselves.'"  *Cappuccitti v. DirecTV, Inc.*, 623 F.3d 1118, 1124 (11th Cir. 2010) (citation omitted).  A "contract of adhesion requiring arbitration is not *per se* unconscionable or unenforceable[.]"  *Hopkins v. World Acceptance Corp.*, 798 F. Supp. 2d 1339, 1346 (N.D. Ga. 2011).

"Under Florida law, unconscionability will invalidate an arbitration agreement if a party shows that it has procedural and substantive unconscionability."  *Solis v. Am. Express Nat'l Bank*, 2023 WL 4474322, at *2 (M.D. Fla. July 11, 2023), *report and*

---

[137]    Kia Motion 16:9-18; Hyundai Motion 17:1-18.

[138]    Opposition 8:11-11:13.

*recommendation adopted by* 2023 WL 4831307 (M.D. Fla. July 28, 2023). The "procedural and substantive aspects of unconscionability must be present, although not necessarily to the same degree, and both should be evaluated interdependently rather than as independent elements." *Basulto v. Hialeah Auto.*, 141 So. 3d 1145, 1161 (Fla. 2014).

Under New Mexico law, a "contract can be procedurally or substantively unconscionable." *Laurich v. Red Lobster Restaurants, LLC*, 295 F. Supp. 3d 1186, 1210 (D.N.M. 2017). "While there is a greater likelihood of a contract's being invalidated for unconscionability if there is a combination of both procedural and substantive unconscionability, there is no absolute requirement in our law that both must be present to the same degree or that they both be present at all." *Id.* at 1211 (citation omitted). "Procedural and substantive unconscionability often have an inverse relationship. The more substantively oppressive a contract term, the less procedural unconscionability may be required for a court to conclude that the offending term is unenforceable." *Cordova v. World Fin. Corp. of NM*, 146 N.M. 256, 263 (N.M. 2009).

Under New York law, an arbitration agreement "is unconscionable when it is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms." *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010) (internal quotation marks and citation omitted). "Courts assess overall unconscionability by applying a sliding scale where the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa." *Haft v. Haier US Appliance Sols., Inc.*, 578 F. Supp. 3d 436, 452 (S.D.N.Y. 2022) (internal quotation marks and citation omitted).

Under Wisconsin law, "[p]rocedural and substantive unconscionability factors must be weighed 'on a case-by-case basis.'" *Schultz v. Epic Sys. Corp.*, 376 F. Supp. 3d 927, 933 (W.D. Wis. 2019) (citation omitted). "The more substantive unconscionability present, the less procedural unconscionability is required, and vice versa." *Wisconsin Auto Title Loans, Inc. v. Jones*, 290 Wis. 2d 514, 533–34 (Wis. 2006).

### 1.    Procedural Unconscionability

#### a.    Applicable Law

Under California law, procedural unconscionability "concerns the manner in which the contract was negotiated and the circumstances of the parties at that time." *Kinney v. United HealthCare Servs., Inc.*, 70 Cal. App. 4th 1322, 1329 (1999). The focus is whether there is "oppression or surprise due to unequal bargaining power." *Poublon*, 846 F.3d at 1260 (quoting *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 236 (2012)). Oppression "arises from an inequality in bargaining power

which results in no real negotiation and an absence of meaningful choice." *Stirlen v. Supercuts, Inc.*, 51 Cal. App. 4th 1519, 1531 (1997). Surprise is defined as "the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms." *Gatton v. T-Mobile USA, Inc.*, 152 Cal. App. 4th 571, 581 (2007) (citation and quotations omitted).

Under Georgia law, courts look to the following factors to determine whether a contract is procedurally unconscionable: "age, education, intelligence, business acumen and experience of parties, their relative bargaining power, the conspicuousness of and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of meaningful choice." *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1377 (11th Cir. 2005) (citation omitted).

Under Florida law, the "absence of meaningful choice when entering into the contract is often referred to as procedural unconscionability, which relates to the manner in which the contract was entered[.]" *Basulto*, 141 So. 3d at 1157 (citation omitted). A contract of adhesion is a "strong indicator that the contract is procedurally unconscionable because it suggests an absence of meaningful choice," but "the presence of an adhesion contract alone does not require a finding of procedural unconscionability." *VoiceStream Wireless Corp. v. U.S. Commc'ns, Inc.*, 912 So. 2d 34, 40 (Fla. Dist. Ct. App. 2005) (internal quotation marks and citation omitted).

Under New Mexico law, procedural unconscionability "is determined by analyzing the circumstances surrounding the contract's formation, such as whether it was an adhesive contract and the relative bargaining power of the parties." *Laurich*, 295 F. Supp. 3d at 1211. Adhesion contracts "generally warrant heightened judicial scrutiny," and adhesion contracts are "procedurally unconscionable and unenforceable when the terms are patently unfair to the weaker party." *Jerry Erwin Assocs., Inc. v. Est. of Asher by & through Zangara*, 290 F. Supp. 3d 1213, 1241 (D.N.M. 2017) (citation omitted).

Under New York law, even "a form contract that is offered on a 'take it or leave it' basis" may be valid and "inequality in bargaining position alone is not sufficient." *Catalano v. MarineMax*, 590 F. Supp. 3d 487, 506 (E.D.N.Y. 2022) (internal quotation marks and citation omitted).

Under Wisconsin law, "[p]rocedural unconscionability relates to factors bearing on the meeting of the minds of the contracting parties, such as age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms would have been permitted by the drafting party, and whether there were alternative providers of the subject matter of the contract." *Aul v. Golden Rule Ins. Co.*, 304 Wis. 2d 227, 245 (Wis. Ct. App. 2007).

### b.    Analysis

Plaintiffs assert that the arbitration agreements are procedurally unconscionable because the agreements are contracts of adhesion, Plaintiffs were not aware of the arbitration agreements, and Plaintiffs had no opportunity to opt out of the arbitration agreements.[139]  Kia and Hyundai respond that an adhesion contract is not automatically procedurally unconscionable, and Plaintiffs either enrolled or authorized the dealer employees—as their agents—to enroll them in Kia Connect or Hyundai BlueLink Services.[140]

The Court concludes that the degree of procedural unconscionability here is minimal.  The arbitration agreements are indeed contracts of adhesion.  However, Plaintiffs have not shown that the arbitration agreements are oppressive or patently unfair.  Therefore, this very minimal degree of procedural unconscionability does not bar enforcement of the arbitration agreements.

### 2.    Substantive Unconscionability

### a.    Applicable Law

Under California law, substantive unconscionability focuses "on overly harsh or one-sided results." *Armendariz*, 24 Cal. 4th at 114 (citation omitted).  An arbitration clause is substantively unconscionable if the terms "are so one-sided as to shock the conscience." *Kinney*, 70 Cal. App. 4th at 1329.  The mutuality of the agreement is the "paramount consideration" in assessing substantive unconscionability. *Pokorny v. Quiztar*, 601 F.3d 987, 997-98 (9th Cir. 2010).  "Agreements to arbitrate must contain at least 'a modicum of bilaterality' to avoid unconscionability." *Id.* (internal citations and quotations omitted).

"Under Georgia law, an unconscionable contract is 'such an agreement as no sane man not acting under a delusion would make and that no honest man would take advantage of.'" *Caley*, 428 F.3d at 1378 (citing *Hall v. Fruehauf Corp.*, 179 Ga. App. 362, 362 (1986)).  Under Florida law, substantive unconscionability focuses on "the unreasonableness of the terms." *Basulto*, 141 So. 3d at 1157-58.  Under New Mexico law, substantive unconscionability "is found where the contract terms themselves are illegal, contrary to public policy, or grossly unfair." *State* ex rel. *King v. B & B Inv. Grp., Inc.*, 329 P.3d 658, 670 (N.M. 2014).  Under New York law, "[s]ubstantive unconscionability exists where the contractual terms are grossly unreasonable and favor the party seeking to

---

[139]    *Id.* at 10:20-11:13.

[140]    Kia Reply 18:14-19; Hyundai Reply 17:20-18:7.

enforce the contract." *Doe #1 v. Coll. Bd.*, 440 F. Supp. 3d 349, 355–56 (S.D.N.Y. 2020) (internal quotation marks and citation omitted). Under Wisconsin law, substantive unconscionability "refers to whether the terms of a contract are unreasonably favorable to the more powerful party. The analysis of substantive unconscionability requires looking at the contract terms and determining whether the terms are 'commercially reasonable,' that is, whether the terms lie outside the limits of what is reasonable or acceptable." *Coady v. Cross Country Bank*, 299 Wis. 2d 420, 440 (Wis. Ct. App. 2007).

### b.    Analysis

Plaintiffs maintain that the arbitration agreements are substantively unconscionable because they create "infinite arbitration clauses."[141] But Kia and Hyundai counter that the arbitration agreements are sufficiently limited.[142] For example, Kia contends that the arbitration provision "is limited to disputes arising out of the agreement, Kia Connect (which includes vehicle charging features), Plaintiffs' vehicles, and Plaintiffs' use of their vehicles."[143] Similarly, Hyundai asserts that the arbitration provision "is limited to disputes arising out of the agreement itself, Connected Services (which includes vehicle charging features), Plaintiffs' vehicles, and Plaintiffs' use of their vehicles. The arbitration agreement would not, for example, extend to a shareholder suit against Hyundai. If Plaintiffs were employed by Hyundai, the arbitration agreement would not cover employment claims, either."[144]

After considering the relevant facts and applicable law, the Court concludes that the arbitration agreements are not substantively unconscionable. The Court agrees with Defendants' assertions that the arbitration agreements are sufficiently limited. Plaintiffs have failed to show that the arbitration agreements are grossly unreasonable.

Thus, the Court concludes that the arbitration agreements are only minimally procedurally unconscionable and that they are not substantively unconscionable. Accordingly, the arbitration agreements are not unenforceable for unconscionability.

### D.    Discovery

Plaintiffs request limited discovery regarding the enforceability of the arbitration agreements.[145] Defendants oppose that request, arguing that Plaintiffs have failed to

---

[141]    Opposition 9:1-10:15.

[142]    Kia Reply 18:1-19; Hyundai Reply 16:15-20.

[143]    Kia Reply 18:3-5.

[144]    Hyundai Reply 16:15-20.

[145]    Opposition 11:14-12:24.

demonstrate how discovery would produce evidence showing that the arbitration provisions are invalid.[146]  In view of its analysis set forth above, the Court agrees with Defendants' contentions.  Accordingly, the request for discovery is **DENIED**.

### E.    Stay

Kia and Hyundai assert that this matter must be stayed pending arbitration.[147]  "When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding."  *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024).  Accordingly, this case is **STAYED** pending arbitration.

## V.  DISPOSITION

For the foregoing reasons, the Court hereby **ORDERS** as follows:

1.      The Kia Motion [ECF No. 29] is **GRANTED**.

2.      The Hyundai Motion [ECF No. 32] is **GRANTED**.

3.      Plaintiffs are **DIRECTED** to pursue their respective claims for relief through appropriate arbitration proceedings, in accordance with the arbitration provisions in the Kia Connect agreement and the Hyundai BlueLink agreement.

4.      This matter is **STAYED** until further order of the Court.  Any party may move at any time to modify or vacate the stay, for good cause shown.

5.      The parties are **DIRECTED** to file no later than April 4, 2025, and every 90 days thereafter, a Joint Report that advises the Court regarding the posture of the arbitration proceedings.

6.      The Clerk is **DIRECTED** to close this case administratively.

**IT IS SO ORDERED.**

Dated:    January 3, 2025

John W. Holcomb
UNITED STATES DISTRICT JUDGE

---

[146]    Kia Reply 18:20-25; Hyundai Reply 18:8-16.

[147]    Kia Motion 16:22-18:11; Hyundai Motion 18:19-20:18.